IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                               Crim. No. 06-759 MCA

JONATHAN PABLO,

    Defendant.

## ORDER DENYING
## RULE 33 MOTION FOR A NEW TRIAL

      This case is before the Court upon Defendant Jonathan Pablo's Rule 33 Motion for a New Trial.  The Court has considered the written submissions of the parties, the record in this case, and the applicable law, and is otherwise fully advised.

**Background**

      On January 15, 2007, a jury found Defendant guilty of aggravated sexual abuse, kidnaping, assault resulting in serious bodily injury, and car jacking.  The jury found his co-defendant, Isaac Gordo, guilty of aggravated sexual abuse, kidnaping, assault with a dangerous weapon, assault resulting in serious bodily injury, and car jacking. On January 14, 2010, while Defendant's appeal was pending, co-defendant Gordo filed a motion for a new trial asserting the following grounds:  (1) newly discovered medical evidence, (2) ineffective assistance of Gordo's trial counsel, Cindy Turcotte, and (3) newly discovered evidence of *Brady* violations.  [Doc. 228 at 2]  On January 15, 2010, Defendant filed a motion for joinder in Gordo's motion for a new trial.  [Doc. 230]  On October 27, 2010, the Court granted Defendant Pablo leave to pursue a motion for a new trial limited to claims of newly discovered medical evidence and newly

discovered evidence of *Brady* violations, denying Defendant's motion for joinder in all other respects.[1]  [Doc. 264]  Co-defendant Gordo's Rule 33 motion was resolved with respect to Gordo by a November 10, 2010 judgment. [Doc. 270]  On June 29, 2012, Defendant filed a document captioned Motion for New Trial Based on Newly Discovered Medical Evidence and *Brady* Violations and Memorandum in Support. [Doc. 280]  Defendant's convictions were affirmed on September 6, 2012.  *United States v. Pablo*, 696 F.3d 1280 (10th Cir. 2012).

**Newly Discovered Evidence**

Defendant argues that a new trial is justified by his "discovery of medical evidence impeaching and discrediting the opinions of one of the Government's witness [sic] regarding tears to the fourchette of the alleged victim's vagina. . . ."  [Doc. 280 at 1]  A defendant seeking a new trial on the basis of newly discovered evidence must establish:

> "(1) the evidence was discovered after trial; (2) the failure to discover the evidence was not caused by the defendant's lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues     . . . involved; and (5) the new evidence would probably produce an acquittal in a new trial."

*United States v. Harris*,  735 F.3d 1187, 1193 (10th Cir. 2013) (quoting *United States v. Pearson*, 203 F.3d 1243, 1274 (10th Cir. 2000)).

A few facts will place this claim in context.  The victim, sixteen-year-old LRH, was sexually assaulted in the early hours of January 30, 2005. During the evening of January 30, 2005, LRH was examined by Lucy Boulanger, M.D. at the Crownpoint, New Mexico Healthcare Facility of the Indian Health Service.  Dr. Boulanger documented her examination in two sets of

---

[1] Defendant and his co-defendant were represented by separate retained counsel. Pablo was represented at trial by attorney Art Nieto; Gordo was represented at trial by attorney Cindy Turcotte.

records:  (1) a State of Arizona Sexual Assault Examination Report ("SAER") [Doc. 229-11], and (2) a document titled "Crownpoint Triage and Nurses Notes" [Doc. 229-12].  The SAER includes the following observation:  "post fourchette has 2 tears vertically . . . ."  The Triage and Nurses Notes include the following observation:  "tears to post fourchette. . . ."  The United States provided the Triage and Nurses Notes to the defense as early as April 2005 [Doc. 142 at 189; Tr. at 338], but no later than April 2006 [Doc.142 at 243], in the course of discovery.  The AUSA prosecuting the case obtained a copy of the SAER for the first time on the morning of the second day of trial, January 10, 2007, from Kortney Snider, a criminalist with the Arizona Department of Public Safety Crime Lab in Flagstaff, Arizona.  The Crime Lab had received the SAER from Donovan Becenti, an evidence technician with the Navajo Department of Criminal Investigation in Crownpoint, who had collected the SAER and rape kit from Dr. Boulanger. [Doc. 138 at 29-33, 38, 40; Tr. at 29-33, 38, 40]  The AUSA prosecuting the case immediately provided the defense with the SAER. [Doc. 142 at 182; Tr. at 331]

      Claiming unfair surprise at the late disclosure of the SAER, Defendant asked the Court to prohibit Dr. Boulanger from testifying about the sexual assault exam.  [Doc. 142 at 214-15, 218; Tr. at 363-64, 367]  The Court denied this request. The Court permitted the United States to question Dr. Boulanger about the sexual assault exam to the extent it was described in the Triage and Nurses Notes or based upon her independent recollection. [*Id.* at 218, 229-30; Tr. at 367, 378-79]

      During the United States' case-in-chief, Dr. Boulanger testified as a fact witness, with one exception:  she testified that the posterior fourchette is "the most common area to sustain the stress of penetrating trauma to the vagina." [Doc. 142 at 245; Tr. at 394]  Neither defendant

3

objected to this statement.  On cross-examination, Defendant's counsel proceeded with a line of questioning which elicited from Dr. Boulanger her unequivocal expert opinion that the injuries to LRH's vagina were inconsistent with consensual sex.  [Doc. 142 at 253; Tr. at 402]

Various exhibits to co-Defendant Gordo's motion for a new trial suggest that there is ongoing scientific debate about the correlation between observed injury to a woman's posterior fourchette and lack of consent to intercourse giving rise to the injury.  Defendant argues that this medicolegal literature constitutes newly discovered evidence within the meaning of Rule 33.

The Court is not entirely convinced that Defendant's claim truly is one of newly discovered evidence.  Clearly, the same facts can give rise to both a claim of newly discovered evidence and a claim of ineffective assistance of counsel.  *See, e.g., United States v. Garcia-Alvarez*, 541 F.3d 8, 18 (1st Cir. 2008).  The proper characterization can be important when the government argues that a claim is untimely. *Compare* Fed. Crim. P. Rule 33(b)(1) *with* (b)(2).  Defendant's claim can readily be conceptualized as ineffective assistance of counsel in which trial counsel's performance (his failure to appreciate the significance of the references to tears to the posterior fourchette in Dr. Boulanger's treatment notes and to act upon those references in preparing for trial) assertedly fell below a standard of objective reasonableness and prejudice assertedly is shown by the exculpatory character of the evidence that a hypothetical professionally reasonable investigation would have developed (the medicolegal articles found by Gordo's post-conviction counsel).  *See Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005).

Assuming, *arguendo*, that Defendant is correct in characterizing his claim as one of newly discovered evidence, he fails to satisfy the elements of his claim.  In particular, Defendant has not shown that the evidence he claims is newly-discovered could not have been discovered

4

before trial in the exercise of due diligence. *See United States v. Silva-Arzeta*, 602 F.3d 1208, 1219 (10th Cir. 2010) ("A defendant requesting a new trial based on newly discovered evidence must have been diligent in seeking the evidence before the verdict was rendered."). Here, the record establishes that Defendant received a copy of the Triage and Nurses Notes documenting "tears post fourchette." Although not denominated as the report of a sexual assault examination, the Triage and Nurses Notes unquestionably document a sexual assault examination. Defense counsel who even casually reviewed the Triage and Nurses Notes would have understood that Dr. Boulanger examined LRH as a self-reporting victim of sexual assault. A few minutes of legal research would have led trial counsel to numerous sexual assault cases discussing the significance of evidence of injury to the victim's posterior fourchette. *E.g.*, *Darn v. Knowles*, No. C 02-2892 SI (PR), 2003 WL 21148412 (N.D. Cal. May 14, 2003) (relying on evidence of victim's vaginal injuries in conducting harmless error analysis of state trial court's admission of habeas petitioner's prior sexual offense); *Beale v. Commw.*, Record No. 1808-03-2, 2004 WL 832573 (Va. Ct. App. April 20, 2004) (affirming admission of testimony by sexual assault nurse as to causation of alleged victim's injuries); *People v. Abelar*, No. D039147, 2003 WL 22954171 (Cal. Ct. App. Dec. 16, 2003) (summarizing testimony of dueling medical experts in sexual assault case); *State v. Burt*, 828 So.2d 717 (La. Ct. App. 2002) (summarizing evidence supporting conviction; noting testimony by nurse concerning rape exam including tear in victim's posterior fourchette, which was "not normal and could only have occurred from force"); State *v. Brant*, No. 99-P-0037, 2000WL 1114845 *3 (Ohio Ct. App. Aug. 4, 2000) (noting testimony by nurse that victim's symptoms were consistent with forced sexual intercourse); *cf. Commw. v. Johnston*, No. CRIM. 98321, 2000 WL 33177221 (Va. Cir. Nov. 1, 2000) (surveying medico-

legal literature on significance of vaginal injury in sexual assault cases; excluding testimony of sexual assault nurse describing "human sexual response").[2] Apart from proprietary electronic legal research services, various internet search engines would have been readily available to Defendant. "Due diligence has not been exercised if the defendant or his counsel could have, without unusual effort, acquired the evidence before or during the trial." *United States v. Dimattina*, 885 F. Supp.2d 572, 577 (E.D. N.Y. 2012). Defendant has failed to establish that the medicolegal literature he now cites as newly-discovered evidence could not have been discovered prior to trial in the exercise of due diligence by Defendant or his attorney. *See Garcia-Alvarez*, *supra* (failure to develop cell-phone triangulation evidence confirming alibi); *United States v. Devila*, 216 F.3d 1009, 1015-17 (11th Cir. 2000) (failure of defendants to develop evidence that seized vessel was not stateless), *vacated in part on other grounds* 242 F.3d 995 (11th Cir. 2001) (per curiam). Accordingly, Defendant's motion for a new trial on the ground of newly discovered evidence is denied.

**Brady Violation**

Defendant argues that "[Dr. Boulanger's] SANE notes, the evidence of fourchette tears, and the basis for the doctor's opinions regarding the fourchette tears were essential for the defense to be in a position to prepare to challenge [Dr. Boulanger's] testimony and opinions on cross examination. Thus, they were essential to impeach [Dr. Boulanger], and under the *Strickler* standard they were subject to pre-trial production under *Brady* as 'favorable' evidence." [Doc. 280 at 14]. The elements of a *Brady* violation are well established: (1) the prosecution

---

[2]Although many of these cases are unpublished decisions, their significance is not their precedential value, but rather, the information they convey about how evidence of tears to the alleged victim's posterior fourchette may be used by the prosecution at trial.

suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense. *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004).

As previously noted, Dr. Boulanger's sexual assault examination was documented in two sets of records: (1) the SAER and (2) "Crownpoint Triage and Nurses Notes. Defendant's *Brady* claim based on the SAER report fails for multiple reasons. First, the crucial information concerning the tears to LRH's posterior fourchette is contained in the Triage and Nurses notes, which were disclosed months before trial. The SAER report was disclosed during Defendant's trial, immediately following the AUSA's receipt of the report from Ms. Snider. Defendant did not seek a continuance to give counsel additional time to incorporate the information in the SAER report in Defendant's defense. Under the circumstances such as these, there is no basis for asserting that the United States suppressed the crucial evidence of the tears to LRH's posterior fourchette. *United States v. Brooks*, 727 F.3d 1291, 1300 n.7 (10th Cir. 2013). Second, Defendant has not demonstrated that the SAER contains favorable evidence. The substance of the SAER is either inculpatory, or at best, neutral. To the extent that *Brady* and its progeny encompass evidence with impeachment value, *e.g., Strickler v.Greene,* 527 U.S. 263, 280 (1999), Defendant has not demonstrated how the SAER report could have been used to impeach the testimony Dr. Boulanger gave on direct exam. Defendant has not directed the Court to any material inconsistency between the SAER and Dr. Boulanger's testimony on direct exam or between the SAER and the Triage and Nurses Notes. The circumstances of this case and those of *Strickler*, the authority cited by Defendant, are clearly distinguishable. *See* 527 U.S. at 282 ("The contrast between (a) the terrifying incident that [the eyewitness] confidently described in her testimony and (b) her initial perception of that event 'as a trivial episode of college kids

carrying on' that her daughter did not even notice, suffices to establish the impeaching character of the undisclosed documents.").

Defendant also claims that the United States suppressed Dr. Boulanger's opinion that the tears to LRH's fourchette were inconsistent with consensual intercourse. The following facts will be helpful in analyzing this claim. On December 14, 2006, the United States filed a Notice of Intent to Introduce Expert Witness Testimony Pursuant to Rules 702, 703 and 705. [Doc. 64] The Notice stated with respect to Dr. Boulanger that she "will testify regarding her treatment of [LRH] (discovery docs. 43-47). While Dr. Boulanger, is a direct eyewitness, she may provide testimony revealing opinions or scientific, technical or specialized knowledge. Out of an abundance of caution, she is noticed here as an expert witness. His [sic] curriculum vitae has been requested and will be forwarded immediately to defense counsel once our office receives it." At trial, the United States did not tender Dr. Boulanger as an expert. [Doc. 142 at 219-20; Tr. at 368-69] Dr. Boulanger testified on direct examination as a fact witness, with the exception of her opinion that the posterior fourchette is "the most common area to sustain the stress of penetrating trauma to the vagina." [Doc. 142 at 245; Tr. at 394] It was not until Defendant's cross-examination that Dr. Boulanger offered her opinion that tears to the posterior fourchette are inconsistent with consensual intercourse. [Doc. 142 at 253; Tr. at 402]

Although the United States disclosed Dr. Boulanger as a potential expert witness, the United States did not provide Defendant with a Fed. Crim. P. 16(a)(1)(G) written summary of the testimony it intended to elicit from Dr. Boulanger on direct exam.[3] But since a Rule

---

[3]On April 20, 2006, the Court entered a discovery order deeming Defendant to have requested discovery from the government unless he filed a waiver of discovery within seven days of the order. [Doc. 29] Upon Defendant's failure to file a timely waiver, he was deemed to have requested discovery from the government.

16(a)(1)(G) summary is limited to "the witness's *opinions*, the bases and reasons for those *opinions*, and the witness's qualifications," the United States was not required to produce a Rule 16(a)(1)(G) summary to the extent Dr. Boulanger was being called to testify as a fact witness, recounting her first-hand observations of LRH's demeanor, physical appearance, and injuries, as opposed to opinions drawn from those observations.  Moreover, Dr. Boulanger's opinion that LRH's injuries were inconsistent with consensual sex was elicited by Defendant, not the United States.  Rule 16(a)(1)(G) applies only to testimony that "the *government* intends to use under Rule 702, 703, or 705 during its case-in-chief at trial."  Rule 16(a)(1)(G) cannot reasonably be read to impose on the United States a duty to provide a defendant with a summary of the opinions and bases of opinions to be elicited *by the defendant* during cross-examination of a government witness.  The United States did not violate Rule 16(a)(1)(G) with respect to Dr. Boulanger's opinion regarding the significance of the tears to the victim's posterior fourchette.

There is no constitutional right to pretrial discovery of witnesses in non-capital cases. *United States v. Nevels*, 490 F.3d 800, 803 (10th 2007).  Dr. Boulanger was free to decide whether to make herself available to defense counsel for a pre-trial interview, and in view of the absence of evidence that the United States instructed her not to cooperate with the defense, Defendant's constitutional rights were not violated by her failure to make herself available to defense counsel prior to trial.  *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997)  Defendant does not point to any rule of criminal procedure that would have entitled Defendant to interview Dr. Boulanger prior to trial, and as already noted, the limited right of discovery provided by Rule 16(a)(1)(G) was inapplicable to opinions other than opinions used by the United States in its case-in-chief.

The Court is not persuaded by Defendant's attempt to shoehorn into the *Brady* framework his complaint about lack of access to a summary of Dr. Boulanger's opinions and the bases of those opinions. The first element of a *Brady* claim is suppression of evidence by the prosecution. Defendant has not shown that a Rule 16(a)(1)(G) summary or other documentation of Dr. Boulanger's opinion and the basis of her opinion about the significance of the tears to the victim's posterior fourchette existed. Indeed, there is no evidence in the record that Dr. Boulanger expressed such an opinion or the basis of her opinion to anyone, orally or in writing, prior to Defendant's cross-examination of Dr. Boulanger at trial. Defendant must establish that the evidence in issue existed before he can claim that such evidence was suppressed. *United States v. Sukumolachan*, 610 F.2d 685 (9th Cir. 1980) (observing that *Brady* "does not require the government to create exculpatory material that does not exist").

The second element of a *Brady* claim is that the evidence in question be favorable to the defense. As Defendant concedes, "[t]he case was predominantly about rape, and the predominant defense was that the sexual intercourse was consensual." [Doc. 280 at 3] Given this characterization of the case, Dr. Boulanger's opinion clearly is inculpatory as it tends to exclude the possibility that Defendant engaged in lawful, consensual intercourse. Dr. Boulanger's testimony about the basis for her opinion shows that it was supported by observations made over the course of ten years during which she examined many hundreds of women. [Doc. 142 at 252-56] Dr. Boulanger's opinion and the basis of her opinion cannot reasonably be viewed as favorable.

Lastly, with respect to the third element of a *Brady* claim, Defendant necessarily is relying on the argument rejected by the Supreme Court in *United States v. Agurs*, 427 U.S. 97

(1976), that *inculpatory* evidence should be disclosed pursuant to *Brady* if it would assist the defendant in preparing for trial. The Supreme Court rejected this approach to materiality, reasoning "that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense." *Id.* at 112 n.20. "An earlier argument that the materiality test should be defined in terms of the defendant's ability to prepare for trial (rather than in terms of factfinders' assessments of guilt) was explicitly rejected by the Court in *United States v. Agurs*." *Matthew v. Johnson*, 201 F.3d 353, 361 (5th Cir. 2000) (citation to reporter omitted). Here, the allegedly suppressed information--Dr. Boulanger's opinion--clearly is incriminating; the exculpatory evidence is the medicolegal literature that Defendant claims he might have discovered in time for trial if he had known about Dr. Boulanger's opinion prior to trial. *Brady* does not confer a right to pretrial discovery of incriminating evidence even though knowledge of that evidence might lead the defense to seek out opposing exclupatory evidence. *See United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1200 (C.D. Cal. 1999).

      To summarize, Defendant has not shown that the United States suppressed Dr. Boulanger's opinion that the victim's vaginal injuries were inconsistent with consensual intercourse or the basis for that opinion. Further, Dr. Boulanger's opinion and the basis for her opinion would not have been favorable to the defense, either substantively or for impeachment. Lastly, the fact that knowledge of Dr. Boulanger's opinion and the basis for that opinion would have been of assistance to the defense in preparing for trial does not bring her purely inculpatory opinion and the basis for that opinion within *Agurs*' definition of materiality. Defendant's *Brady* claim fails all three of the prongs.

**Conclusion**

Defendant has failed to establish that he is entitled to a new trial based upon newly-discovered medical evidence or newly-discovered evidence of a *Brady* violation. His motion for a new trial will be denied.

**WHEREFORE**, **IT IS THEREFORE HEREBY ORDERED** that Defendant's Jonathon Pablo's Rule 33 Motion for a New Trial is **denied.**

So ordered this 20th day of December, 2013.

M. CHRISTINA ARMIJO
Chief United States District Judge